## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| WASSEEM HAMDAN, Derivatively on Behalf of INTERCLOUD SYSTEMS, INC., | Index No: |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| vs. | |
| MARK MUNRO, MARK F. DURFEE, CHARLES K. MILLER, NEAL L. ORISTANO, and ROGER M. PONDER, | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and, | |
| INTERCLOUD SYSTEMS, INC., | |
| Nominal Defendant. | |

Plaintiff Waseem Hamdan ("Plaintiff"), by and through his undersigned counsel, derivatively on behalf of Nominal Defendant InterCloud System, Inc. ("InterCloud" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by InterCloud with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of InterCloud against certain of its officers and directors seeking to remedy Defendants' breach of fiduciary duties, gross mismanagement and unjust enrichment that occurred between December 2013 to the present (the "Relevant Period") and have caused substantial harm to InterCloud.

2.      During the Relevant Period, Defendants engaged in reckless and callous business practices and failed to exercise even a modicum of due diligence.  Specifically, Defendants caused the Company to issue numerous false and misleading statements by way of independent analyst research reports posted on investor websites such as *seekingalpha.com* and *wallstcheatsheet.com*.  At least four such articles were published by four (4) different authors. Defendants' promotional campaign was incredibly successful.  The Company's share price soared to over $19 per share in late December 2013, more than quadruple its NASDAQ opening price of $4.00 on October 31, 2013.

3.      However, Defendants failed to disclose that: (a) these bullish articles touting the Company stock were actually commissioned by the Company using its paid promoter CSIR Group, LLC ("CSIR"); (b) CSIR had actively recruited freelance writers to pen these positive articles on the Company to be disguised as independent research; (c) the Company's management, including Defendant Mark E. Munro ("Munro), reviewed and approved the articles prior to their publication; and (d) the freelance writers were paid per article by CSIR and the Company to hype the Company's stock.  As a result of the foregoing omissions, Defendants' pro-InterCloud articles published during the Relevant Period were materially false and misleading.

4.      Since the Company remains under the control and/or influence of the primary wrongdoers, namely Defendants who: (a) have made decisions in violation of the business

judgment rule, (b) have substantial conflicts, and (c) may be implicated in the commission of the wrongful conduct alleged herein, the Company is unable to protect itself or remedy the wrongs inflicted upon it.  Accordingly, this derivative action must be brought and vigorously prosecuted to protect and vindicate the rights of Company.

## JURISDICTION

5.      This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.      Venue is proper in this Court because the Company maintains its executive office at 1030 Broad Street, Suite 102, Shrewsbury, NJ 07702, a substantial portion of the transactions and wrongs complained of herein occurred in the County of Monmouth, and Defendants have received substantial compensation within the District of New Jersey by doing business here and engaging in numerous activities that had an effect in this jurisdiction.

## PARTIES

**A.      Plaintiff**

7.      *Plaintiff Wasseem Hamdan* is, and was at relevant times, a shareholder of InterCloud.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.  Plaintiff is a citizen of Maryland.

**B.      Nominal Defendant**

8.      *Nominal Defendant InterCloud* is a Delaware corporation with principal executive offices located in Shrewsbury, New Jersey.  The Company bills itself as a global single-source provider of value-added services for both corporate enterprises and service providers offering cloud and managed services, professional consulting services and voice, data,

and optical solutions to assist its customers in meeting their changing technology demands.

**C.**    **Director Defendants**

9.     ***Defendant Mark E. Munro*** ("Munro") has been the Company's Chief Executive Officer ("CEO") and Chairman of Board since December 2011.  Upon information and belief, Munro is a citizen of New Jersey.  Munro is the founder and has been President of Munro Capital Inc., a private equity investment firm, since 2005.  Further, Munro has been the CEO and owner of 1112 Third Ave Corp., a real estate holding company, since October 2000.  As of March 25, 2014, Munroe beneficially owned 6.9% of Company common stock.  As of June 30, 2014, he beneficially owned 9.9% of Company common stock.

10.     ***Defendant Mark F. Durfee*** ("Durfee") has been a member of the Company's Board since December 2012.  Upon information and belief, Durfee is a citizen of New Jersey. Durfee is a member of the Compensation Committee, the Audit Committee, and the Chairman of the Governance and Nominating Committee.  As of March 25, 2014, Durfee beneficially owned 7.9% of Company common stock.

11.     ***Defendant Charles K. Miller*** ("Miller") has been a member of the Company's Board since November 2012.  Upon information and belief, Miller is a citizen of New Jersey. Miller is a member of the Compensation Committee, Chairman of the Audit Committee, and a member of the Governance and Nominating Committee.

12.     ***Defendant Neal L. Oristano*** ("Oristano") has been a member of the Company's Board since December 2012.  Upon information and belief, Oristano is a citizen of New Jersey. Oristano is the Chairman of the Compensation Committee, a member of the Audit Committee, and a member of the Governance and Nominating Committee.

13.     ***Defendant Roger M. Ponder*** ("Ponder") has been the Company's Chief

Operating Officer from November 2012 until March 20, 2015. Upon information and belief, Ponder is a citizen of Florida. Ponder was appointed a member of the Company's Board on November 12, 2015.

14. Defendants Munro, Durfee, Miller, Oristano, and Ponder are hereinafter referred to as the "Director Defendants."

## CODE OF BUSINESS CONDUCT AND ETHICS

15. As members of InterCloud's Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies, and assuring the integrity of its financial and business records.

16. The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of InterCloud, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF DEFENDANTS

17. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of InterCloud, Defendants owed InterCloud and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required Defendants to use their utmost abilities to control and manage InterCloud in an honest and lawful manner. Defendants were and are required to act in furtherance of the best interests of InterCloud and its investors.

18. Each director of the Company owes to InterCloud and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers

and/or directors of a publicly held company, Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

19.     To discharge their duties, the officers and directors of InterCloud were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of InterCloud were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how InterCloud conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or

practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

20.     Each defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.   The conduct of Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of InterCloud, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

## SUBSTANTIVE ALLEGATIONS

A.     **Background**

21.     InterCloud bills itself as a single-source provider of end-to-end information technology ("IT") and next-generation network solutions to the telecommunications service provider and corporate enterprise markets through cloud platforms and professional services. The Company offers cloud and managed services, professional consulting and staffing services, and voice, data and optical solutions to assist its customers in meeting their changing technology demands.   InterCloud's engineering, design, installation, and maintenance services support the

build-out and operation of some of the most advanced enterprise, fiber optics, Ethernet, and wireless networks.

22.     Though the Company was incorporated in 1999, it functioned as a development stage company with limited activities for the next 10 years. Then, in January 2010, InterCloud acquired Digital Comm., Inc., which specialized in specialty contracting services primarily in the installation of fiber optic telephone cable.  InterCloud's operations thus picked up, and through September 2012, substantially all of the Company's revenues derived from such specialty contracting services.  As a result of subsequent acquisitions, InterCloud has since diversified its revenue sources to include telecommunications staffing services and additional specialty contracting services.

**B.     The Undisclosed Paid Promotional Scheme**

23.     The Company's stock traded over-the-counter on the OTCQB Marketplace until its initial public offering on the NASDAQ on October 31, 2013.  With newfound exposure moving from the pink sheets to the NASDAQ, and coming off its most successful quarter to date, the Company immediately sought to make itself a more recognizable name among investors.

24.     Beginning no later than December 2013, at the Company's direction, CSIR undertook a campaign to publicly tout the Company's stock to artificially inflate InterCloud's share price. This promotional campaign, which included numerous published articles[1] on third-party investor websites like *seekingalpha.com* and *wallstcheatsheet.com*, was indeed successful. The Company's stock price soared to a high of $19.39 on December 31, 2013 just weeks after opening on the NASDAQ at approximately $4 per share. The articles commissioned by the

---

[1]     When Defendants' fraudulent promotional scheme was ultimately revealed beginning in March 2014, these third-party websites summarily removed the articles in question for violating the websites' terms of use by not disclosing the authors' paid relationships with the subjects of their articles.

Company caused the price of its stock to more than quadruple during the Relevant Period.

25.     The Company's illicit promotional campaign was designed to increase shareholder value and raise visibility for the Company, which it succeeded in doing. However, the articles failed to disclose that they were penned by paid promoters under the Company's direction with the Company's approval, or that any financial relationship existed between the articles' authors and the Company.

**C.      "5 Reasons To Buy InterCloud Systems Right Now"**

26.     The Relevant Period begins on December 3, 2013 when an article entitled "5 Reasons To Buy InterCloud Systems Right Now," authored by Thomas Meyer ("Meyer") under the pseudonym "Equity Options Guru,"[2] was posted on *seekingalpha.com* (the "12/03/13 Article"). This 12/03/13 Article boasted of the Company's growth, noting the Company's recent announcement of "record third quarter earnings" and promising that "[a] look at the revenue growth pattern over the past 3 years should really make investors smile." "The quick and steady growth of InterCloud Systems has been as strong as any company."

27.     The 12/03/13 Article praised the Company's recent acquisitions, which "should pave the way for one of InterCloud System's main goals which is to expand internationally." Further, "successful international expansion could help InterCloud Systems generate revenue in the hundreds of millions."

28.     Among the noted advantages of the Company's cloud services, the 12/03/13 Article highlighted that the Company's InterCloudVm cloud services platform "will offer several competitive advantages which should help to further drive revenue growth in the future." Those

---

[2]     Two Relevant Period articles on InterCloud posted on *seekingalpha.com* were penned by "Kingmaker" and "Equity Options Guru." As discussed *infra*, Meyer published articles under each of these pseudonyms to create the false impression that multiple analysts were excited about the stock of whichever company he was then promoting.

competitive advantages included cost savings, increased speed, improved information security, and decreased deployment time.

29.    The 12/03/13 Article also highlighted the Company's "soaring share price" and listed the advantages of the Company stock having recently moved from the OTCQB to the NASDAQ exchange: (i) greater liquidity for investors; (ii) better execution fills for investors; and (iii) allowing institutional investors to enter the market for InterCloud shares.  It added, "Now that InterCloud Systems has reached a more appropriate valuation of roughly $50 million, investors need to determine whether it is undervalued at today's price.  I believe that it is."

30.    Comparing revenue growth rates for the first three quarters of 2013 and estimating revenues for the fourth quarter, the 12/03/13 Article went on to state that the Company "is currently valued at less ($50 million) than what it is expected to generate in total sales ($61.2 million).  At the very least, InterCloud Systems should be trading at 2x price/sales ratio.  That would value the company at $122.4 million and indicate a trading price of $19 per share ($122.4 million valuation/shares outstanding of 6.41 million)."  The 12/03/13 Article continued, "If InterCloud Systems can produce a strong 4th quarter number, I expect that shares will begin trading closer to the company's true valuation."

31.    The 12/03/13 Article then concluded, "InterCloud Systems appears to be making all the right moves.  The company has been able to generate consistent and solid revenue growth while turning in its largest net income during the most recent quarter.  By combining an effective corporate growth plan with a state of the art technology platform, it appears that InterCloud Systems shares may be headed much higher over the next several months."

32.    As a result of this bullish 12/03/13 Article, the Company stock rallied strongly on December 3, 2013, from an opening share price of $7.63 to a closing price of $10.40,

representing a gain of over 36%.

33.    However, the 12/03/13 Article failed to disclose that Meyer was being paid by CSIR and InterCloud to offer his enthusiastic opinions about the Company's stock.   CSIR representative Herina Ayot ("Ayot") had reached out to Meyer twice in November 2013 seeking a write-up to develop "a convincing investor argument" on InterCloud stock.   Ayot's emails to Meyer are attached hereto as **Exhibits A and B**.   On November 13, 2013, Ayot confirmed Meyer would be paid $500 with the goal of publishing his 12/03/13 Article on *seekingalpha.com* or *wallstcheatsheet.com*.   A copy of this confirmation is attached hereto as **Exhibit C**.

34.    Meyer similarly failed to disclose that the Company management, particularly Munro (InterCloud's CEO and Chairman of the Board) actually controlled the content of his 12/03/13 Article because he was given the opportunity to review, edit, and approve his 12/03/13 Article before it was submitted for publication on *seekingalpha.com*.   Meyer wrote to Ayot on December 1, 2013 to provide a draft of his pro 12/03/13 Article.   In that email, attached hereto as **Exhibit D**, Meyer gushed, "Please see the attached article on InterCloud.   This is a good one!"   The next day, on December 2, 2013, Ayot instructed Meyer, "Hold on . . . the company [InterCloud] is now telling me they have minor changes."   This email is attached hereto as **Exhibit E.**

35.    Subsequently, in a separate email attached hereto as **Exhibit F**, Ayot forwarded Meyer numerous "markups" to the 12/03/13 Article emanating directly from Munro and Dan Sullivan (InterCloud's Chief Accounting Officer).   The Company, by way of Sullivan and Munro, and CSIR, by way of Ayot, thus tightly controlled the message in Meyer's 12/03/13 Article, a message they had bought and paid for.   In short, Defendants failed to disclose in the 12/03/13 Article that Meyer's purportedly independent analysis of InterCloud was, in actuality, a

paid advertisement for the Company that had been carefully reviewed, edited, and controlled by the Company's executive leadership, including Munro.

36.    The 12/03/13 Article's failure to make these disclosures violated the Terms of Use of *seekingalpha.com*. Indeed, *seekingalpha.com* demands that all "User Submissions" (such as the above 12/03/13 Article posted by Meyer) abide by the following disclosure rules:

> You may not write about a stock with the intention to boost or reduce the stock's price and sell (or buy) the stock into the resulting strength or weakness.

> Abide by the following conflict of interest rule: You will disclose any material relationships with companies whose stocks you write about in a User Submission or parties that stand to gain in any way from the viewpoint you are outlining. Examples: You must disclose if you are employed by a company whose stock you are writing about; perform consulting for a company you write about; receive paid advertising revenue or any other form of sponsorship fee from a company you write about. This applies to narrow asset classes as well.  For example, if you are paid to promote a gold dealer, that must be disclosed in any User Submission about gold.

> If you choose an alias, be responsible for all statements made and acts or omissions that occur by use of your alias.

37.    Further, under *seekingalpha.com*'s Terms of Use, users like Meyer may not:

> Post or transmit any Content that you either know or should know is false, deceptive or misleading, or misrepresent or deceive others as to the source, accuracy, integrity or completeness of any comment you post.

> By use of your alias or in any comment, impersonate any person or entity, falsely or deceptively state, infer or otherwise misrepresent your affiliation with or connection to any person or entity.

> Post or transmit any advertising, promotional materials, so called "chain letters," "pyramid" or other schemes or invitations to participate in these or any other form of solicitation or promotion.

> Violate any local, state, national or international law, regulation or order of any court, including but not limited to regulations of the U.S. Securities and Exchange Commission, any rules of any securities exchange, including without limitation, the New York Stock Exchange, the American Stock Exchange or The Nasdaq Stock Market.

38.     Defendants owed a duty to disclose that the 12/03/13 Article was actually a paid promotion for the Company, written at Defendants behest and paid for by CSIR and InterCloud. Defendants also owed a duty to disclose that Meyer's purportedly independent analysis was actually reviewed, edited, and ultimately approved by CSIR and InterCloud management, including Munro.

39.     The 12/03/13 Article, which was reviewed and ratified by each of the parties named above, was thus false and misleading for omitting the above disclosures of CSIR's and InterCloud's control over its publication and dissemination to the market.  By disseminating the Company's tightly controlled message using Meyer's alias as a purported research analyst, Defendants misleadingly created false "buzz" for the Company's stock to help drive up InterCloud's share price.

**D.     "Watch How InterCloud Grows Under The Guidance Of Mark Munro"**

40.     Two weeks later, on December 17, 2013, another Article was posted on *seekingalpha.com* entitled "Watch How InterCloud Grows Under The Guidance Of Mark Munro" (the "12/17/13 Article").  The 12/17/13 Article, written by freelance author John Mylant ("Mylant"), touted Munro's talents and expressed great confidence in InterCloud with Munro at the helm.  "Mark Munro has been in the IT and telecom industry since 1985 and has been building and investing in the IT, telecom and cloud venues since 1990.  When he took over the company in 2012[,] he saw that the opportunity for growth was in the cloud. Under his guidance, I see great opportunity for growth out of InterCloud (ICLD)."

41.     In reference to a recently announced acquisition by InterCloud, the 12/17/13 Article asserted it "just goes to prove how Mr. Munro will be able to guide this company and continue to help it prosper."  This was "a significant acquisition for the company that was made

13

possible by the sale of $11.625 million aggregate principal amount of 12% convertible debentures.  Under the guidance of Mr. Munro, the company continues to grow and bring value to shareholders."

42.     The 12/17/13 Article continued, "The Cloud, according to management, should be the company's greatest percent of growth in the future.  The company does not resell other company's cloud platforms, it has its own.  While many cloud providers tend to look like 'rebranded data storage companies,' InterCloud is transitioning into a 'cloud integration company' that will custom design and manage private cloud networks, manage large telecom networks as well as service legacy IT networks for enterprise clients.  The company does cable installation for its WiFi and DAS customers, but it is not the bread-and-butter of its revenue base. It will be leveraging the relationships it has with service providers and large enterprises in network management with the intent to transfer people to its own cloud platform."

43.     "Under Mark Munro's guidance, the company has started to see the growth it anticipates.  The news that revenue increased to $43 million for the first nine months of 2013 and announcing net income of $1.3M in Q03 sent the stock soaring.  If the company continues to perform like it has under Mr. Munro, I believe that it's possible to surpass the $60 million in revenue by year end.  The company's larger clients tend to spend more of their money in the latter half of the year and a larger piece of the company's revenue has traditionally come in the fourth quarter."

44.     The 12/17/13 Article further highlighted, "The company will continue to grow in the cloud space.  Even though it is growing at 20% organically in the first 9 months of 2013, the company expects to continue to grow.  At that rate it will also look for acquisitions with the intent to give themselves a broader geographic presence and additional distribution capabilities

for cloud and managed services."

45.     Addressing recent volatility in the Company's share price, the 12/17/13 Article shrugged it off as "reactionary moves" and assured it was "safe to say the stock is back in the range that it's used to trading.  From a historical range perspective I believe the stock is right where it should be.  Can Mr. Munro raise the value of the stock from here?  As I have already mentioned earlier, I believe the answer to this question is yes.  Investors can observe positive reaction to the announcement of the acquisition on Friday, December 13th, as it significantly increases the revenue on a yearly basis and is immediately accretive to earnings."  Moreover, "[a]s the company continues to grow, I am watching it take steps to stay focused on shareholder value, not growth at the expense of its shareholders."

46.     The 12/17/13 Article also noted, "While the company increased revenue by 80% year-over-year, it also increased debt by 100%.  It does not end here though.  The company raised $8 million in its October public offering and has been chopping off debt since its September financials."  Further, "[s]ince the end of the third quarter, the company has been able to eliminate nearly $10 million in liabilities while raising more than $7.7 million in the public capital markets.  This has opened up the door for the company to grow its operating divisions."

47.     The 12/17/13 Article concluded, "If investors are looking for a company to invest in the long-term for value and growth, I believe InterCloud could make a good candidate.  I believe this because I believe the CEO, Mark Munro, has the know-how and ability to guide this company into a much larger and profitable entity.  My words are not merely speculation. The numbers behind the company since he has taken over speak for themselves."

48.     As a result of Mylant's bullish 12/17/13 Article posted after the market closed on December 17, 2013, the Company stock jumped to $10.46 per share on December 18, 2013 on

heavy trading volume, an increase of over 5% from the previous day's close of $9.89.

49.     Moreover, upon information and belief, the 12/17/13 Article also assured investors of the following:

> I wrote this article myself, and it expresses my opinions. I am not receiving compensation for it (other than from Seeking Alpha).  I have no business relationship with any company whose stock is mentioned in this article.

50.     The foregoing assurance violated *seekingalpha.com*'s Terms of Use (¶¶ 34-35, above) and was materially false and misleading because, Mylant was being paid by CSIR and InterCloud to enthusiastically tout the Company's stock.  Further, the 12/17/13 Article failed to disclose that InterCloud management, including Munro, was given the opportunity to review, edit, and approve its contents before it was submitted for publication on *seekingalpha.com*.  Prior to the 12/17/13 Article's publication, Mylant exchanged numerous emails with Christine Petraglia (the founder and principal of CSIR) and CSIR representative Ayot concerning preparation of the 12/17/13 Article.  On December 6, 2013, Ayot emailed Mylant to request "a Seeking Alpha article for ICLD."  Ayot pointed him to Meyer's recent 12/03/13 Article and stated, "We want to do a follow up next week.  They [the Company] are putting out a press release Monday or Tuesday and this new article should follow that."  Mylant quickly agreed to this arrangement and offered to begin work immediately.  But Ayot instructed him to hold off until the subject of the to-be published article became clear: "OK well we'll want to incorporate ICLD's upcoming news that hasn't been released yet.  We don't know what it is but we should know soon and I will let you know . . . ."  A copy of Mylant's and Ayot's December 6, 2013 email exchange is attached hereto as **Exhibit G**.

51.     On December 8, 2013, Mylant wrote to Petraglia under the subject "ICLD." Mylant's email, which is attached hereto as **Exhibit H**, began, "If I am going to write a positive

spin on this company, I believe what I'm going to need to do is focus on the time. That CEO Mark Munro took it over." He went on to give Petraglia "a list of things I need to address if I am going to give the company any value." *See* Ex. H. Petraglia then presented Mylant's list of questions to Munro and Lawrence Sands (InterCloud's then-Senior Vice President and Corporate Secretary). On December 9, 2013, Petraglia received responses from Munro and Lawrence Sands (InterCloud's then-Senior Vice President and Corporate Secretary), which she immediately forwarded to Mylant in an email attached hereto as **Exhibit I**; Mylant quickly responded to Petraglia, "This is perfect, I will work on it today!"

52.     The next day, on December 10, 2013, Ayot emailed Mylant again to update him on the impending InterCloud press release. Ayot wrote, "Hi John, ICLD release didn't go out today. Maybe tomorrow. I will let you know." Significantly, Ayot added: "I want to be sure you don't publish any article before that is out. So I'll be in touch…" A copy of Ayot's email is attached hereto as **Exhibit J**.

53.     Days later, on December 13, 2013, Petraglia finally forwarded Mylant the Company's soon-to-be-issued press release: "Hi John, good Friday morning to you. Attached is [the] release for ICLD [that] will be out prior to market open today. Once you have it complete please email back so I can have Mark [Munro] review." A copy of Petraglia's email is attached hereto as **Exhibit K**.

54.     Later, after having submitted a draft Article for the Company's review, Mylant received an email from Petraglia on December 15, 2013 advising that Munro "may want to change something minor" in Mylant's draft and for Mylant to "please stand by." This email is attached hereto as **Exhibit L**. Shortly thereafter, Petraglia sent Mylant a follow-up email after speaking with Munro. In her follow-up, Petraglia explained that Munro had concerns about

Mylant's article portraying "cloud being new to the Company," which he acknowledged was true but wondered why should it be highlighted in the article. Petraglia instructed Mylant that Munro would "be available later at 5pm EST if you have any issue with changing it." *See* Ex. L.

55.     Mylant did not publish the 12/17/13 Article on InterCloud until receiving final approval from both CSIR and InterCloud.    In fact, Mylant would only be compensated if the 12/17/13 Article approved by CSIR and InterCloud was published.

56.     In short, the 12/17/13 Article falsely represented that Mylant's research and conclusions on InterCloud were his own when, in fact, the 12/17/13 Article was nothing more than a paid advertisement for the Company.   Defendants owed a duty to disclose that the 12/17/13 Article was actually a paid promotion for InterCloud, written at the Company's behest and paid for by CSIR and InterCloud.   Defendants also owed a duty to disclose that Mylant's supposedly independent analysis was actually reviewed, edited, and approved by CSIR and InterCloud management, including Munro, prior to publication.

57.     The 12/17/13 Article, which was reviewed and ratified by each of the parties above, was thus false and misleading for claiming independence from InterCloud when, in reality, the Company and CSIR were paying for and controlling its contents.   By disseminating InterCloud's tightly controlled message using Mylant's name as a purported research analyst, the Company misleadingly created false "buzz" for the Company's stock to help drive up InterCloud's share price.

**E.     "InterCloud Systems: A Cloud Integrator With Strong Growth Potential"**

58.     Similarly, on January 13, 2014, an article entitled "InterCloud Systems: A Cloud Integrator With Strong Growth Potential," authored by "Kingmaker" – another of Thomas Meyer's pennames (*see* supra note 2) – was posted on *seekingalpha.com* (the "01/13/14

Article"). In that 01/13/14 Article, the Company stock was touted as a small-cap stock that has "the ability to generate outsized returns over the coming months and years." This was because "[t]he company has made several important announcements and the marketplace has rewarded InterCloud Systems for its foresight."

59.     The 01/13/14 Article described InterCloud as "operating in one of the hottest areas of the market which is poised for significant growth in the coming years. The shares have already begun to participate in a rally that was long overdue. Shares of InterCloud Systems have appreciated by nearly 350% since the beginning of November. . . .  That performance made InterCloud Systems one of the hottest and best performing stocks of 2013. But now it's time to look to the future to see if shares will continue their rapid ascent. I believe they will."

60.     Advising investors in small-cap technology companies to pay attention to those companies' earnings growth, strategy, and technology, the 01/13/14 Article touted: "InterCloud Systems appears to be firing on all 3 cylinders." First, the Company's reported third quarter 2013 "earnings were so spectacular that the share price soared by more than 250% during the following trading session." Reported total revenue of $16.2 million "represented a 448% year-over-year increase. The growth occurred because of organic growth and strategic acquisitions. The company also had a stellar performance because of its gross profit and net income numbers."

61.     Additionally, "[t]he company appears to be doing what is necessary for increasing revenue growth while minimizing cost. This has led to a positive net income which all investors will be sure to take notice of. Because of the company's market capitalization and funding needs, it's also extremely important to take a look at the company's balance sheet, particularly the company's cash balance. As of September 30, 2013, InterCloud Systems had approximately $3.4 million in available cash."

62.     Regarding liabilities, the 01/13/14 Article noted, "It's important to note that the company made an importance [sic] announcement regarding its balance sheet on January 8, 2014. InterCloud announced that it had reduced its liabilities by approximately $7.2 million as of the end of 2013. The reduction in liabilities included" retiring preferred stock, paying down a $1.8 million promissory note, and repayment of $1.8 million of principal. "Because of the growing revenue and rising share price, it appears that InterCloud Systems will continue to be able to reduce liabilities which will in turn help the company to continue minimizing its costs."

63.     Second, "[i]n addition to the phenomenal earnings growth shown thus far, InterCloud Systems is also an ideal investment because of its strategy." Third, "[i]n addition to a growing revenue stream and a successful growth strategy, InterCloud Systems also has the added benefit of being in an incredibly hot niche within the technology sector called cloud." With the cloud services market expected to grow in the coming years, "[i]nvestors might be asking, 'Cloud growth is expected to increase but why will InterCloud benefit from that?' The answer is simple. InterCloud's design has several significant advantages . . . ."

64.     On the topic of risks, the 01/13/14 Article focused on when to invest: "It's clear that InterCloud Systems appears to be on the right path. But traders and investors should be aware of the risks. Given the rising revenue, net income growth, and adequate cash balance, dilution doesn't appear to be a major concern. The concern I would have would be deciding on an appropriate entry point for an investment. Given the rapid rise in valuation, investors may be worried about an ill-timed investment. To combat that worry, investors may want to consider scaling into a position."

65.     The 01/13/14 Article concluded, "InterCloud Systems appears to be an extremely promising small-cap technology company. Given that the stock market is at an all-time high,

investors need to think outside the box to identify companies that will outperform. InterCloud Systems appears to be such an opportunity. Because of its growing revenues, its unique strategy, and a hot technology niche, investors may want to consider an investment in this company."

66.     The Company's share price soared following publication of this overly confident 01/13/14 Article. After closing at $15.35 on January 13, 2014, the Company stock shot up to $17.03 on January 14, 2014, a nearly 11% increase on extremely heavy trading volume. The next day, January 15, 2014, the Company stock continued to rise to $18.13 per share on heavy trading volume. This two-day rally amounted to an 18% gain for the Company stock.

67.     Additionally, upon information and belief, the 01/13/14 Article contained a blatantly false assurance of Meyer's independence from InterCloud:

> I wrote this article myself, and it expresses my opinions. I am not receiving compensation for it (other than from Seeking Alpha). I have no business relationship with any company whose stock is mentioned in this article.

68.     The foregoing assurance violated *seekingalpha.com*'s Terms of Use (*see* ¶¶ 34-35 above) and was materially false and misleading because Meyer was being paid by CSIR and InterCloud to eagerly hype the Company's stock, and the Company was likewise given wide latitude in editing and controlling the 01/13/14 Article's contents. To be sure, on January 7, 2014, it was Meyer who initially received an email request from CSIR representative Ayot to put together the pro 01/13/14 Article: "Hey Tom, we want to do another article on InterCloud. Wondering do you use any other aliases on SA [*seekingalpha.com*] for some variety?" Ayot's January 7, 2014 email to Meyer is attached hereto as **Exhibit M**. Petraglia was copied on the email.

69.     Meyer quickly responded offering to write a new InterCloud Article under his "Kingmaker" alias for $500. A copy of Meyer's response to Ayot and Petraglia is attached

hereto as **Exhibit N**.   Later that same day, Ayot replied to Meyer (copying Petraglia) confirming the $500 rate.   Ayot further instructed that InterCloud "wanted another spin on it [the article] because they want investors to see them in another light."   She asked Meyer, "Do you have time to speak with the company on a call tomorrow?  It would be brief."   A copy of Ayot's reply is attached hereto as **Exhibit O**.   The following day, January 8, 2014, Meyer participated in a conference call with InterCloud to discuss the Article.

70.     The 01/13/14 Article also failed to disclose to the market that InterCloud management, including Munro, was given the opportunity to review it and edit it before it was submitted for publication on *seekingalpha.com*.   Meyer first emailed a draft of the 01/13/14 Article to Ayot and Petraglia on Friday, January 10, 2014 (attached hereto as **Exhibit P**). Petraglia quickly responded, copying Ayot, that she would get back to Meyer "after Mark [Munro] or Larry [Sands, InterCloud's then-Senior Vice President and Corporate Secretary] take a quick review!" A copy of Petraglia's response is attached hereto as **Exhibit Q**.

71.     Two days later, on Sunday, January 12, 2014, Petraglia sent Meyer an edited draft of his Article with changes made by herself and by Munro.   Petraglia's email, attached hereto as **Exhibit R**, indicated to Meyer, "Attached please find the FINAL with only some changes/updates, Datacenter info was wrong and some other minor changes in the document in Red and Blue.  Any questions please let Herina and I know."

72.     Minutes later, Petraglia sent Meyer another email offering additional detail on what InterCloud and Munro wanted from the Article.   Ayot was also copied on the email, which is attached hereto as **Exhibit S**.   Petraglia asked Meyer, "TOM, can you use the below? Its [sic] important they get across Intercloud as being a CLOUD Integrator.  I think the 1st paragraph describes this.  Can we incorporate that somewhere in your article?  I just spoke to CEO and he

sent me the info below." Copied below Petraglia's message were more than four paragraphs of Munro's thoughts on what to include in Meyer's Article. Munro had prefaced his thoughts with the following: "Does any of this help you and your writers at all??"

73.     Upon seeing these new requests of Meyer from Petraglia and Munro, Ayot separately wrote to Meyer (with Petraglia copied): "Hi Tom, Looks like we will need to wait until tomorrow to submit. Once you send us a revised copy with the info in the first paragraph added in, we'll just review once more." A copy of Ayot's email is attached hereto as **Exhibit T**.

74.     Later that night, on January 12, 2014, Meyer forwarded Ayot and Petraglia a new draft of the article incorporating suggested changes. Meyer explained to Ayot and Petraglia: "I read my 2nd paragraph and that already appears to be focused on InterCloud's services, especially the cloud integration part. I also changed the title of the article to: 'InterCloud Systems: A Cloud Integrater [sic] With Strong Growth Potential.' All the other changes were made. Let me know if this suffices. I think it's a strong article." A copy of Meyer's transmittal email is attached hereto as **Exhibit U**.

75.     On the morning of January 13, 2014, Petraglia wrote back, "Yes, looks good. I'm sending to CEO [Munro] and will get back to you ASAP. Thanks!" A few minutes later, Petraglia sent another email asking Meyer to "correct the spelling of the word to integrator (not integrater) in the title. Will hopefully get work [sic] from mark [Munro] later this morning. thanks." Copies of Petraglia's emails to Meyer (with Ayot copied) are attached hereto as **Exhibits V and W**, respectively.

76.     Once InterCloud had offered its blessing and the 01/13/14 Article was then posted on *seekingalpha.com* later in the day, Ayot emailed Meyer and Petraglia: "This was fast! Great work!" A copy of Ayot's email is attached hereto as **Exhibit X**.

23

77.     In short, the 01/13/14 Article falsely represented that its research and conclusions on InterCloud were Meyer's own when, in fact, the 01/13/14 Article was nothing more than a paid advertisement for the Company.  Defendants owed a duty to disclose that the 01/13/14 Article was actually a paid promotion for InterCloud, written at the Company's behest and paid for by CSIR and InterCloud.  Defendants also owed a duty to investors to disclose that the 01/13/14 Article's purportedly independent analysis was actually reviewed, edited, and approved by both CSIR and InterCloud management, including Munro, prior to the 01/13/14 Article's publication.

78.     The 01/13/14 Article, which was reviewed and ratified by the Company, was thus false and misleading for assuring investors of Meyer's independence from InterCloud when, in reality, he was being paid by the Company and CSIR to write the 01/13/14 Article, and the Company and CSIR likewise controlled the 01/13/14 Article's contents.  By disseminating InterCloud's tightly controlled message using Meyer's alias as a purported research analyst, the Company misleadingly created false "buzz" for its stock to help drive up its share price.

**F.      "InterCloud Continues to Grow Through Smart Acquisitions"**

79.     Another pro-InterCloud article posted by Meyer was published on February 18, 2014 (the "02/18/14 Article").   Entitled "InterCloud Continues to Grow Through Smart Acquisitions," this 02/18/14 Article was posted on *wallstcheatsheet.com* under Meyer's alias "Christine Andrews."[3]  The 02/18/14 Article advised investors: "Looking ahead, investors may want to stick with the technology sector, which appears to be as strong as ever.  Specifically,

---

[3]      "Christine Andrews" was later revealed to be one of Meyer's many pennames on *wallstcheatsheet.com*.  According to Ms. Andrews' fictitious profile on *wallstcheatsheet.com*, she purported to be "an analyst and fund manager with almost 20 years of investment experience. She covers a variety of industries, with a special focus on technology, and likes to write about value stocks, poorly understood or under-followed situations, and contrarian perspectives."

companies focused on cloud services are performing extremely well.   One cloud-focused company that has had one of the strongest performances over the past three months is InterCloud Systems (NASDAQ: ICLD)."

80.    Touting the Company as a "cloud integrator," the 02/18/14 Article noted, "Although some companies have cloud capabilities, very few also offer professional services like InterCloud does.  That is a key differentiator that allows rapid deployment of cloud services and applications globally.  This differentiator is also a key reason why InterCloud Systems is poised to become a leader in the space."

81.    The 02/18/14 Article goes on to highlight the stock's recent rally: "Since reaching a 52-week low of $2.20 in November, InterCloud shares have rallied by more than 500 percent." It attributes this strong performance to InterCloud's attractive valuation, record earnings growth, and its acquisitions.  Regarding this last point, the 02/18/14 Article notes, "Over the past 12 months, InterCloud Systems has announced several promising acquisitions that have helped to not only grow the company's revenue but also helped improve the company's capabilities.  The most recent acquisition was announced on February 3: InterCloud acquired RentVM because of its unique ability to help customers quickly migrate to and adopt cloud-based services."

82.    The 02/18/14 Article explained:

> RentVM provides end-to-end IT services, including cloud multi-zone architecture, which supports cloud deployment both on the East Coast and the West Coast. RentVM's capabilities also allow customers to utilize a vast array of applications. The more applications that InterCloud's customers use, the higher the revenue production will be.  These advantages should prove extremely beneficial over the coming years as InterCloud continues to expand its reach.

83.    Moreover, "[t]he RentVM acquisition represents another promising opportunity for future revenue generation.  Because of acquisitions like this, InterCloud Systems has been able to boost its revenue and income."  After listing the Company's earnings for each of the

previous four quarters, the 02/18/14 Article summarized: "The growth in revenue represents an average quarter-over-quarter increase of approximately 12.5 percent. Investors should also be aware that InterCloud Systems generated a record $1.465 million in net income for the most recent quarter, ended September 30."

84.     Finally, after showcasing the Company's latest contract with the Brooklyn Hospital Center, the 02/18/14 Article concluded: "Investors looking for the next catalyst should pay attention to the next earnings report, which should be coming out shortly. If InterCloud Systems can produce another strong quarter, the shares could be in for a strong spike."

85.     However, the 02/18/14 Article failed to disclose that Meyer was being paid by CSIR and InterCloud to offer this enthusiastic endorsement of the Company's stock. CSIR representative Ayot emailed Meyer on the morning of February 10, 2014 offering $500 for an article to be published on *wallstcheatsheet.com* and Yahoo! Finance related to InterCloud's recent acquisition of RentVM. A copy of Ayot's email to Meyer is attached hereto as **Exhibit Y**. Petraglia was copied on that email.

86.     The 02/18/14 Article also failed to disclose that InterCloud management, including Munro, was given the opportunity to review, edit, and approve its contents before the 02/18/14 Article was submitted for publication on *wallstcheatsheet.com*. Email communications among Meyer, Ayot, Petraglia, and Lawrence Sands (InterCloud's then-Senior Vice President and Corporate Secretary) on February 14, 2014 reflect InterCloud's review and approval of an initial draft of the 02/18/14 Article. These communications, attached hereto as **Exhibit Z**, indicate "suggested changes from Mark [Munro]" were passed along to Ayot and Petraglia by Sands, who further indicated the Article was now "good to go" after Munro's review. Ayot then forwarded Munro's edits to Meyer and requested he publish the revised article on Tuesday

morning (February 18, 2014) since Monday (February 17th) was a holiday.  Of course, the edited article was indeed posted to *wallstcheatsheet.com* on Tuesday, February 18, 2014.

87.     The 02/18/14 Article failed to disclose that Meyer's purportedly independent research and analysis on InterCloud was, in actuality, a paid advertisement for the Company. Defendants owed a duty to disclose that the 02/18/14 Article was actually a paid promotion for InterCloud, written at the Company's behest and paid for by CSIR and InterCloud.  Defendants also owed a duty to disclose that the 02/18/14 Article's purportedly independent analysis was actually reviewed, edited, and approved by CSIR and InterCloud management, including Munro, prior to the 02/18/14 Article's publication.

88.     The 02/18/14 Article, which was reviewed and ratified by the Company, was thus false and misleading for omitting the above disclosures of CSIR's and InterCloud's control over the contents and timing of the 02/18/14 Article's publication.  By disseminating InterCloud's tightly controlled message using Meyer's alias as a purported research analyst, the Company misleadingly created false "buzz" for the Company's stock to help drive up InterCloud's share price.

G.     **The Truth About The Company's Paid Promotional Scheme Is Revealed**

89.     The truth about the Company's paid promotional scheme was revealed through a series of partial revelations beginning on March 13, 2014 when analyst Richard Pearson released a report entitled, "Behind The Scenes With Dream Team, CytRx And Galena" on *seekingalpha.com*.  This report, attached hereto as **Exhibit AA**, revealed that stock promoter the DreamTeamGroup had attempted to hire him to write paid promotional articles on such companies as CytRx Corp. ("CytRx") and Galena Biopharma, Inc. ("Galena") without disclosing payment.  Pearson's exposé provided detailed evidentiary support in the form of emails and

attachments indicating that CytRx and Galena management were intimately involved in reviewing, editing, and approving the paid articles on their own stock, and were well aware that the articles failed to disclose the paid marketing relationship.

90.    Significant to InterCloud, Pearson's report also revealed the aliases used by DreamTeam's writers to publish the promotional articles on third-party websites like *seekingalpha.com*. At the heart of the scheme was Thomas Meyer, who Pearson revealed to be DreamTeam's ringleader of sorts. It was Meyer who had first contacted Pearson by email and telephone to write the flattering articles on CytRx and Galena. Meyer then introduced Pearson to John Mylant, who had already published numerous pro-CytRx and pro-Galena articles on *seekingalpha.com* and *thestreet.com*. Mylant even confirmed to Pearson that DreamTeam had paid him to write these pro-CytRx and pro-Galena articles, and that management of each company had signed off on the articles first because "that is what they are paying for." Mylant confided in Pearson that he also wrote for other investor relations firms as well, and that those firms paid him more handsomely (a standard rate of $525 per article) than did DreamTeam, which only offered $300 per article.

91.    Pearson's "Behind the Scenes" exposé further revealed that Thomas Meyer often wrote under many aliases for multiple websites. Pertinent here, Meyer's pennames on *seekingalpha.com* were "Wonderful Wizard," "Equity Options Guru," "Kingmaker," and "Expected Growth." On *wallstcheatsheet.com*, Meyer posted articles under his own name as well as that of "Christine Andrews," "James Ratz," and "John Rivers." Of course, "Kingmaker," "Equity Options Guru," and "Christine Andrews" published bullish InterCloud Articles around the same time during the Relevant Period.[4]

---

[4]    Shortly following the publication of Richard Pearson's exposé, the articles previously

92.     On these revelations of a sophisticated network of undisclosed paid promoters, some of whom had similarly written pro-InterCloud Articles during the Relevant Period, InterCloud stock declined $1.19 per share, or over 9%, to close at $11.91 per share on March 13, 2014 on unusually heavy trading volume.

93.     The Company was immediately concerned and began damage control. An email exchange on March 14, 2014 between Mylant and CSIR representative Ayot, attached hereto as **Exhibit BB**, shows CSIR's and InterCloud's worries. Having just discussed the previous day the idea that Mylant prepare a draft of a new pro-InterCloud article, Ayot abruptly changed course: "Your name is hot right now. Article came out today on you and Tom Meyer . . . Maybe we should halt the ICLD [article] for now before they get dragged into the negative spotlight . . . ." Mylant then responded that he would not be using his name to write the article, and that a friend from Great Britain would be submitting the article. But later that evening Ayot reiterated to Mylant, "Intercloud just needs to be reassured that they won't be in hot water."

94.     Just days later, on March 17, 2014, the market learned greater detail of InterCloud's participation in this recently uncovered fraudulent promotional scheme. Journalist Roddy Boyd of the Southern Investigative Reporting Foundation published a report entitled "The Copper Archipelago: InterCloud" highly critical of the Company. After providing a sordid history of InterCloud's colorful corporate roots, Boyd's report, attached hereto as **Exhibit CC**, outlined the Company's more recent endeavors:

> While InterCloud's never-ending flow of press releases proclaiming its new opportunities in a popular sector have certainly attracted buyers, the company's use of promoters—a classic sign of a penny stock—has kept the company in the

---

posted by the complicit freelance writers identified by Pearson (such as Meyer and Mylant) were summarily removed from the investor websites where the articles had originally appeared. Accordingly, most – if not all – of the paid promotional materials authored by these writers are no longer accessible.

spotlight, after a fashion. For example, last week RedChip Companies released a report that put a $47.10 price target on InterCloud's shares.  Looking and reading every bit as crisply as a standard brokerage report, investors might assume that the industry and sales metrics cited for a likely 250% gain in share price were coming from someone who had independently weighted these arguments and made a bold call.

But that would be wrong: the Maitland Fla.-based RedChip is an investor relations firm whose strategy centers on putting out "research reports" written for, and approved by, its clients. In other words, they are press releases seeking to appeal to the marginally aware investor (RedChip's work on behalf of its Chinese clients proved so damaging to investors that they dropped "coverage" of the sector in January 2013.)

For its work on InterCloud, the fine print at the bottom of the 14-page report discloses RedChip was paid 7,500 shares and is being paid a monthly cash fee for six months of investor relations work.

. . . an odd footnote to InterCloud's promotional gambit was the appearance of a pair of articles on the stock market commentary website Seeking Alpha that touted InterCloud's prospects, posted in December [2013] and in January [2014]. Authored by John Mylant and a writer using the pseudonym "Kingmaker," the pieces strongly advocated for InterCloud's bright prospects because of the talent of its management and the fast growth of the cloud computing sector.

Not disclosed was the fact that the authors['] unflinching support for InterCloud was also a function of being paid to promote the share. Last week, Rick Pearson, a West Coast-based investor, posted an article on Seeking Alpha describing how DreamTeamGroup, an investor relations firm ostensibly based in Indianapolis, solicited and paid writers to write enthusiastic, company reviewed and approved articles for release on Seeking Alpha, with the goal being to attract investors and drive up the share price.

According to Pearson, two of the more prolific DreamTeamGroup veiled touts were John Mylant and a man named Tom Meyer, a DreamTeamGroup employee who admitted to using the "Kingmaker" pseudonym.

(Mylant, who contacted the Southern Investigative Reporting Foundation after this story was posted, said he has regularly posted articles and comments on Seeking Alpha and that the opinions he expresses were his own. He acknowledges being contacted by a "Tom"—Mylant did not recall his last name or company— who offered to pay him for articles written about companies he was already interested in. He said he is no longer working with "Tom.")

[Lawrence] Sands [an InterCloud executive at the time] initially denied having heard of or used DreamTeamGroup but after being pressed on the matter said that

30

he has "gotten maybe a few emails from them, stuff that got caught in the 'spam' filter." He continued to argue that it was unlikely InterCloud used DreamTeamGroup for anything, however, since RedChip and a small New York firm, CSIR, were handling the company's investor relations work. (CSIR founder Christine Petraglia said she had nothing to do with this issue, and said she provided InterCloud standard public- and investor relations services.)

95.     Thus, Boyd's exposé painted a more direct picture of InterCloud's paid promotional work with Meyer and Mylant, confirming: (i) InterCloud's relationship with CSIR; and (ii) the Company's undisclosed financial relationships with Meyer and Mylant, who both had stumped for InterCloud stock throughout the Relevant Period.  On this news, InterCloud stock declined $1.28 per share, a nearly 11% drop, to close at $10.59 per share on March 18, 2014 on unusually heavy trading volume.

96.     The day following Boyd's March 17, 2014 report, John Mylant and CSIR representative Herina Ayot had another email exchange, attached hereto as **Exhibit DD**, where Ayot conveyed that CSIR was "laying low right now."  Ayot confided to Mylant, "Reporters are all over us."  Referencing Boyd's report, she warned Mylant, "You and Tom are mentioned and CSIR is mentioned along with Christine's name towards the end . . . ."  And later that morning, she admitted, "Yeah its [sic] crazy. I'll give you a call later to talk about how to proceed. I know Intercloud is nervous now . . . ."

97.     Next, the ties between InterCloud, CSIR, Mylant, and Meyer became all the more clear on March 27, 2014 when Pearson published a follow-up report to his initial March 13, 2014 revelation.  This follow-up, entitled "Behind The Scenes With Proactive, Inovio And Unilife" and attached hereto as **Exhibit EE**, shed further light on InterCloud management's hands-on role in the paid promotional scheme, particularly that of Munro.  Pearson revealed an email communication from CSIR representative Ayot, attached hereto as **Exhibit FF**, seeking positive articles on InterCloud stock to be published on *seekingalpha.com*.  CSIR was looking for

Pearson "to develop convincing arguments around buying the stock," and Ayot even admitted

that CSIR had "commissioned a few articles on ICLD already that you will find on Seeking

Alpha and Wall Street Cheat Sheet. This will give you an idea of the type of article we like."

98.     In her email, Ayot promised that CSIR would pay Pearson $500 per article and,

importantly, advised that Munro would review each article prior to publication: "I can set up a

call with CEO if we need to. If you want to write it, after you write, we would first send a draft

to CEO for review and then have you publish. We pay $500 to you upon publication. That's per

article." Pearson's revelation thus provided the market the first direct link between InterCloud's

management and the fraudulent promotional scheme.

99.     Pearson's March 27, 2014 report further confirmed Meyer's and Mylant's

involvement in the fraud:

> Tom Meyer told me that he was paying John Mylant to write on Galena and other
> stocks. John was a prolific author who had written over 800 articles on Seeking
> Alpha and TheStreet.com. John then confirmed his paid activity in emails to me.
> John also introduced me to another IR firm he does work for, called CSIR.
>
> * * *
>
> The articles on InterCloud [published on Seeking Alpha and Wall StreetCheat
> Sheet, as referenced in Herina Ayot's email] had been written by Mr. Meyer and
> Mr. Mylant, both of whom were working for multiple IR firms besides the Dream
> Team, such as CSIR.

100.    On this news, InterCloud stock tumbled to $6.60 per share, a 10% drop from the

previous day's close of $7.38, on unusually heavy trading volume.

101.    Facing the heat from Pearson's and Boyd's revelations, the Company fired back

on March 28, 2014 with a statement denying any participation in the reported stock promotion

scheme:

> InterCloud . . . became aware last week of allegations made on a website known
> as the Southern Investigative Reporting Foundation ("SIRF") that the Company

purportedly paid certain people to write articles and make certain alleged misrepresentations about the Company. InterCloud takes any such allegations seriously and so, in response, the Company hired a former senior federal prosecutor with the United States Securities and Exchange Commission Division of Enforcement and tasked him with conducting an investigation to determine whether there is any truth to these allegations. As a result of this investigation, the Company is now in a position to state that these allegations are wholly without merit.

102.   Despite the overwhelming evidence presented by both Pearson and Boyd, InterCloud proudly – but falsely – assured investors that such "allegations" were "wholly without merit," a conclusion purportedly supported by the investigative findings of a former senior federal prosecutor with the SEC who had been hired by the Company to vet Pearson's and Boyd's claims. In that same March 28, 2014 press release, Munro was quoted as follows:

> InterCloud has made tremendous strides over the last 18 months. We have grown from little more than $17 million in revenue in 2012, to over $80 million in pro-forma revenues for the twelve months ending September 30, 2013. I take note of the fact that since our public offering on October 31, 2013, every officer and director of our Company has been subject to an underwriter lockup precluding sales of our stock. Nevertheless, because of the seriousness of these allegations, we felt obligated to take the time necessary to investigate whether there was any substance to these claims.

103.   Accordingly, in the midst of the Company's fraudulent promotional scheme unraveling before the market, InterCloud and Munro brazenly doubled-down by denying the scheme's very existence, taking refuge behind the supposed findings of a former SEC prosecutor tasked with investigating Pearson's and Boyd's allegations, and then misdirecting investors' attention to the Company's "tremendous strides over the last 18 months" in building to $80 million in pro-forma revenues. However, in light of the mountain of evidence presented herein of each of the Company's officers and directors involvement in the review, editing, and approval of the various misleading articles published during the Relevant Period, InterCloud's and Munro's assurances in their March 28, 2014 press release were blatantly untrue.

104.    Then, on April 2, 2014, Boyd published his own follow-up to his "Copper Archipelago" report published weeks earlier on March 17, 2014. In this April 2nd follow-up, entitled "The Copper Archipelago: Truth, Lies and InterCloud Systems" and attached hereto as **Exhibit GG**, Boyd noted that "[a] public relations firm that hires authors to write flattering articles about a client[']s prospects without disclosing they are being compensated to do so isn't just gaming public opinion, but is running the risk of violating the Rule 17(b) of the Securities Act of 1933, which mandates disclosure of an economic interest in the promotion or sale of securities."

105.    Further, in the face of an official denial by InterCloud on March 28, 2014 of having ever paid for stock promotions, Boyd assured that he and the Southern Investigative Reporting Foundation "stand by our work":

> Make no mistake: regardless of the findings of InterCloud's former SEC attorney or the forcefulness of its press release, authors were clearly paid to publish favorable articles on InterCloud. Moreover, the shares increased in value during the time of this promotion, and according to the terms of the solicitation, senior management was allowed to see articles prior to publication. The only thing limiting the practice appears to have been the inability to find more authors willing to write on the company.

> As it stands, InterCloud's marketing strategy is already centered on using shareholder capital to whip-up short-term trading interest. Recall how the company retained the RedChip Companies, a Florida-based smallcap stock promotion outfit, paying them in cash and shares. RedChip's signature move is to put out a lengthy, easy-reading press release constructed to look exactly like a brokerage firm's report, including an astronomical "target price," based on grave-seeming metrics that are equal parts surrealist fantasy and comedy.

> The CSIR Group, a Manhattan based investor relations firm under contract to InterCloud, is the enterprise behind the practice that InterCloud's chief executive Mark Munro formally assured investors was—after an internal investigation—inaccurate.

* * *

This email exchange [referenced above] between Rick Pearson (who used a

pseudonym to pose as a prospective author of these articles) and Herina Ayot, an employee of CSIR, is evidence that CSIR was involved in recruiting and paying authors to write favorable, InterCloud-approved articles.

In the most direct terms possible, Ayot laid out to Pearson how CSIR sought an author for an article developing "convincing arguments for buying the stock," one that CEO Mark Munro would review. The author would be paid $500 upon publication of the article.

106.    CSIR representative Ayot confirmed to Boyd that "CSIR recruited and paid writers to write pro-InterCloud articles."   Boyd reported having asked Ayot about Petraglia denying such a practice at CSIR.   Ayot told Boyd bluntly: "Christine lied." Ayot went on to explain, "In [Christine's] defense, this is Wall Street and everyone [lies.]  We had no idea who you are or why you were asking those questions; you might have been an investor or someone posing as one.  We get thousands of calls each day. So we lied to get rid of you."

107.    When pressed further on the seriousness of CSIR's actions on behalf of InterCloud, Ayot declined to comment on the specifics of CSIR's work for InterCloud but reiterated to Boyd: "You need to know that on Wall Street, everyone lies and we lied to you to protect ourselves."

108.    Petraglia, CSIR's founder, later contacted Boyd to clear up the confusion, telling Boyd her "first instinct was to deny that we did this" when he had pressed her about CSIR's practice of paying for promotional articles without disclosure.  She confessed, "I don't speak to many reporters and I guess I made a mistake."

109.    More significantly, Petraglia went on to admit that CSIR had, in fact, paid for promotional articles on InterCloud: "I never focused on this issue, and I had never looked at Seeking Alpha before, so I didn't comprehend that [the lack of disclosure] was a problem." Petraglia candidly explained to Boyd that it had been Ayot's job to line up authors to write articles on behalf of CSIR clients, including InterCloud, but that CSIR had since ceased doing

"that kind of work" for its clients.

110.     Boyd also spoke with John Mylant for his April 2nd follow-up report. Mylant confirmed to Boyd that CSIR had approached him to write about InterCloud and, like Petraglia, claimed ignorance of the disclosure issues surrounding his publication practice. Mylant told Boyd, "I just thought it was a way for me to earn extra money and write about what was interesting to me."

## H.     Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review

111.     On May 23, 2016, the Audit Committee of the Board of Directors of the Company, upon the recommendation of the Company's management, concluded that the Company's previously issued unaudited condensed consolidated financial statements contained in the Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2015, and the disclosures and related communications for that period, should not be relied upon.  During the course of the audit of our financial statements for the year ended December 31, 2015, there were certain errors identified that affected the Company's previously issued financial statements.

112.     On May 24, 2016, InterCloud received a written notice (the "Notice") from the Listing Qualifications Department of The Nasdaq Stock Market ("NASDAQ") indicating that the Company is not in compliance with NASDAQ Listing Rule 5250(c)(1) for continued listing because the Company had not yet filed its Quarterly Report on Form 10-Q for the fiscal quarter ended March 31, 2016 (the "2016 10-Q").  The Notice provided that the Company had until June 17, 2016 to submit a plan to regain compliance with NASDAQ's continued listing requirements.

113.     On May 31, 2016, the Company filed a Form 8-K with the SEC announcing that during the audit process with respect to the Annual Report on Form 10-K for the year ended December 31, 2015, the Company identified an error related to a customer payment received in

the second quarter of 2015. This amount was properly recorded as deferred revenue in the second quarter; however, the revenue and cost of goods sold associated with that transaction were not properly recognized during the third quarter of 2015. This resulted in an understatement of revenue in the amount of $0.7 million, cost of goods sold in the amount of $0.2 million and gross profit in the amount of $0.9 million for the third quarter of 2015. This also resulted in an overstatement of liabilities of $0.9 million at September 30, 2015. Also during the third quarter of 2015, the Company understated the cost of inventory items sold during the third quarter by $0.9 million. This resulted in an understatement of cost of goods sold by such amount during the third quarter of 2015 and an overstatement of inventory by such amount at September 30, 2015.

## I.    **The SEC Subpoenas**

114.    On May 21, 2014, the Company received a subpoena from the SEC that stated that the staff of the SEC is conducting an investigation *In the Matter of Galena Biopharma, Inc.* File No. HO 12356 (now known as "In the Matter of Certain Stock Promotions") and that the subpoena was issued to the Company as part of an investigation as to whether certain investor relations firms and their clients engaged in market manipulation. Between May 2014 and April 2015, the Company produced documents in response to that subpoena and several additional subpoenas received from the SEC in connection with that matter and provided testimony to the SEC.

115.    In May 2015, the Company received information from the SEC that they are continuing an investigation of the Company and certain of our current and former officers, consultants of the company and others, of "possible violation[s]" of Section 17(a) of the Securities Act and Sections 9(a) and 10(b) of the Exchange Act and the rules of the SEC

thereunder in the offer or sale of securities and certain other matters with respect to which the SEC claims it has information, including the possible market manipulation of the Company's securities dating back to January 2013.

**J.     The Securities Class Action**

116.    In March 2014, a complaint was filed in the United States District Court for the District of New Jersey against the Company, the Company's Chairman of the Board and Chief Executive Officer, Mark Munro, The DreamTeamGroup and MissionIR, as purported securities advertisers and investor relations firms, and John Mylant, a purported investor and investment advisor. The complaint was filed on behalf of a class of certain persons who purchased our common stock between November 5, 2013 and March 17, 2014. The complaint alleges violations by the defendants (other than Mark Munro) of Section 10(b) of the Exchange Act, and other related provisions in connection with certain alleged courses of conduct that were intended to deceive the plaintiff and the investing public and to cause the members of the purported class to purchase shares of our common stock at artificially inflated prices based on untrue statements of a material fact or omissions to state material facts necessary to make the statements not misleading. The complaint also alleges that Munro and our company violated Section 20 of the Exchange Act as controlling persons of the other defendants.

117.    The Company filed a motion to dismiss the securities class action amended complaint in late January 2015 and the plaintiffs filed a second amended complaint in early March 2015. The Company filed a motion to dismiss the second amended complaint on March 13, 2015. The Company's motion to dismiss was denied by the Court on October 29, 2015.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

118.    Plaintiff brings this action derivatively in the right and for the benefit of the

Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by Defendants.

119. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

120. Plaintiff is a current owner of InterCloud stock and has continuously been an owner of InterCloud stock during all times relevant to Defendants' illegal and wrongful course of conduct alleged herein. Plaintiff understands his obligation to hold stock throughout the duration of this action and are prepared to do so.

121. During wrongful course of conduct at the Company, the Board consisted of the Director Defendants. Because of the facts set forth throughout this Complaint, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

122. The InterCloud Board is currently comprised of four (5) members – Defendants Munro, Durfee, Miller, Oristano and Ponder. Thus, Plaintiff is required to show that a majority of the Demand Defendants, *i.e.*, three (3), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

123. Defendants face a substantial likelihood of liability in this action because they caused the Company to issue false and misleading statements concerning its future prospects. Because of their advisory, executive, managerial, and directorial positions with the Company, each of the Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

124. Defendants either knew or should have known of the false and misleading

statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

125.    Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

126.    Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

127.    Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

128.    Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action.  Each of them is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending themselves in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

129.    Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the

Company.

## THE DIRECTOR DEFENDANTS ARE NOT INDEPENDENT OR DISINTERESTED

### Defendant Munro

130.    Munro is not disinterested or independent, and therefore, is incapable of considering demand because Munro (as CEO) is an employee of the Company who derives substantially all of his income from his employment with InterCloud, making him not independent. As such, Munro cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

131.    Munro also lacks independence from Defendants Durfee, Miller and Oristano, defendants who are not disinterested and who exert influence over Munro's compensation by virtue of their positions as representing the entire Compensation Committee.

132.    Further, as of March 25, 2014, Munroe beneficially owned 6.9% of Company common stock. And on June 30, 2014, he beneficially owned 9.9% of Company common stock. Where, as here, the controlling shareholder is a named defendant, demand futility is presumed.

133.    On July 3, 2014, the Company obtained an unsecured $3.0 million interim revolving line of credit from MMD Genesis LLC, the Mark Munro 1996 Charitable Remainder UniTrust, CamaPlan FBO Mark Munro IRA, Mark Munro, Pascack Road, LLC (a company controlled by Durfee), and Forward Investments, LLC, all of which are related parties, to provide the Company working capital as well as cash to make certain of our amortization payments in respect of the Convertible Debentures.

134.    In addition, Munroe is directly implicated in the scheme to inflate the Company's stock price through numerous false and misleading statements by way of independent analyst

research reports posted on investor websites such as *seekingalpha.com* and *wallstcheatsheet.com*.

**Defendant Durfee**

135.    As of March 25, 2014, Durfee beneficially owned 7.9% of Company common stock.  Where, as here, the controlling shareholder is a named defendant, demand futility is presumed.

136.    MMD Genesis LLC (two of the principals are Munro and Durfee) made loans to the Company in the aggregate principal amount of $3,675,000 to fund certain of the Company's working capital requirements and a portion of the cash purchase price of the Company's acquisition of IPC.  At December 31, 2012, the Company had outstanding loans from MMD Genesis in the aggregate principal amount of $350,000.

137.    Thus, as a result of Durfee's business relationship with Munro in MMD Genesis LLC, Durfee cannot independently consider any demand to sue Munro for breaching his fiduciary duties to the Company.

**Defendants Miller and Oristano**

138.    As members of the Governance and Nominating Committee, Miller and Oristano had a duty, among other things, to annually review the corporate governance guidelines of the Company; and monitor and evaluate the performance of the Board and lead the Board in an annual self-assessment of its practices and effectiveness.

139.    Miller and Oristano breached their fiduciary duty of loyalty by failing to ensure that the Company had an adequate system of internal controls in place to prevent the misrepresentations made by CSIR and those they employed and the scheme to artificially inflate the Company stock price.  Indeed, Miller and Oristano knowingly or recklessly disregarded any such controls by causing and facilitating CSIR to misrepresent that the articles they published

about the Company were not paid for by the Company directly or indirectly. Accordingly, Miller and Oristano breached their fiduciary duties in failing to implement such internal controls and, therefore, face a substantial likelihood of liability.

**Defendants Durfee, Miller and Oristano**

140.    During the Relevant Period, Defendants Durfee, Miller (Chairman) and Oristano (a majority of the Board) served as members of the Audit Committee. Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee are responsible for, *inter alia*, overseeing the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company. Specifically, the members of the Audit Committee are required to:

> Review the Company's annual audited financial statements and related disclosure, including Management's Discussion and Analysis of Financial Condition and Results of Operations, prior to the release or filing of such information with the SEC. This review should include discussion with management and independent auditors of significant issues regarding accounting principles, practices, and judgments. Obtain from the independent auditors assurance that the audit was conducted in a manner consistent with Section 10A of the Securities Exchange Act of 1934. The Audit Committee shall recommend to the Board whether the audited financial statements should be included in the Company's annual report on Form 10-K.

> Review with financial management and the independent auditors the Company's quarterly financial results prior to the release of earnings and/or the Company's quarterly financial statements and related disclosure, including Management's Discussion and Analysis of Financial Condition and Results of Operations, prior to the filing of such information with the SEC. The Committee shall discuss any significant changes to the Company's accounting principles and any items required to be communicated by the independent auditors in accordance with SAS 61. The Committee Chairperson, or a Committee member designated by the Chairman, may represent the entire Committee for purposes of this review.

> Review and approve all Company press releases containing financial information prior to issuance pursuant to the Company's press release approval matrix, as revised from time to time.

> Review the integrity, adequacy, and effectiveness of the Company's financial

reporting processes and accounting and financial controls. Discuss the critical accounting practices and policies with management, the independent auditors, the internal auditors, and appropriate financial and accounting personnel of the Company. Elicit any recommendations for the improvement of such internal control procedures or particular areas where new or more detailed controls or procedures are desirable.

Review significant findings and analyses prepared by the independent auditors and the internal auditors, together with management's responses to those findings or analyses.
Review information related to the finances and operations of the Company with the Chief Financial Officer and, if applicable, appropriate internal audit personnel of the Company in closed sessions on a regular basis.

Continue to maintain independent oversight of the Company's financial organization by ensuring that the Chief Financial Officer and internal audit function both have dual reporting obligations, requiring them to provide information related to the finances and operations of the Company both to the Chief Executive Officer and, independently, directly to the Committee in closed sessions on a regular basis.

141. Defendants Durfee, Miller and Oristano breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise, failed to ensure that adequate internal controls were in place regarding the serious accounting issues and deficiencies described above. Therefore, Defendants Durfee, Miller and Oristano face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## **FIRST CAUSE OF ACTION**

### **Against Defendants for Breach of Fiduciary Duties**

142. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

143. Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, Defendants owed and owe the Company the highest obligation of good faith, fair

dealing, loyalty, and due care.

144.    Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

145.    Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. In breach of their fiduciary duties owed to InterCloud, Defendants caused and facilitated CSIR to misrepresent that the articles they published about InterCloud were not paid for by InterCloud directly or indirectly, and failed to properly oversee InterCloud's business, rendering them personally liable to the Company for breaching their fiduciary duties.

146.    Defendants had actual or constructive knowledge that Defendants caused and facilitated CSIR to misrepresent that the articles they published about InterCloud were not paid for by InterCloud directly or indirectly and were thus written for the purpose and effect of artificially inflating the price of InterCloud's common stock.  Defendants had actual knowledge of the above misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

147.    As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

148.    As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### Against Defendants for Gross Mismanagement

149.   Plaintiff incorporates by reference and re-alleges each allegation contained above, as though fully set forth herein.

150.   By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of the Company in a manner consistent with the operations of a publicly held corporation.

151.   As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, the Company has sustained significant damages in excess of millions of dollars.

152.   Because of the misconduct and breaches of duty alleged herein, Defendants are liable to the Company.

## THIRD CAUSE OF ACTION

### Against Defendants for Unjust Enrichment

153.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein

154.   By their wrongful acts and the omissions of material fact that they caused to be made, Defendants were unjustly enriched at the expense of, and to the detriment of, the Company.

155.   During the Relevant Period, Defendants either received bonuses, stock options, or similar compensation from the Company that was tied to the financial performance or artificially inflated valuation of the Company or received compensation that was unjust in light of

46

Defendants' bad faith conduct.

156.    Plaintiff, as a shareholder and a representative of the Company, seeks restitution from Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary duties.

**REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.    Awarding, against all Defendants and in favor of the Company, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: June 22, 2016

**GAINEY McKENNA & EGLESTON**

By: /s/ Barry J. Gainey

47

Barry J. Gainey, Esq. (7560)
95 Route 17 South, Suite 310
Paramus, NJ 07652
Telephone: (201) 225-9001
Facsimile: (201) 225-9002
Email: bgainey@gme-law.com

-and-

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
440 Park Avenue South
New York, NY  10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0380
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*